<u>**NOT FOR PUBLICATION**</u>

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| FIBERMARK NORTH AMERICA, INC., | : | |
| | : | CIVIL ACTION NO. 07-839 (MLC) |
| Plaintiff, | : | |
| | : | **MEMORANDUM OPINION** |
| v. | : | |
| | : | |
| LISA P. JACKSON, | : | |
| | : | |
| Defendant. | : | |
| | : | |

<u>**COOPER, District Judge**</u>

Plaintiff, FiberMark North America, Inc. ("FiberMark"),
moves before the Court for a preliminary injunction against
defendant, Lisa P. Jackson, Commissioner of the State of New
Jersey Department of Environmental Protection ("NJDEP"):

> (1) Enjoining Defendant from causing or allowing any
> further discharges from the Landfill Drain System to
> FiberMark's Lagoons or Property and, thus, to the
> Musconetcong River;
>
> (2) Mandating that Defendant immediately take whatever
> action is necessary to cease any further discharges
> from the Landfill Drain System to FiberMark's Lagoons
> or Property and, then, to the Musconetcong River; and
>
> (3) Enjoining Defendant from threatening to and/or
> acting upon her threats to take civil and/or criminal
> enforcement action against FiberMark and/or its
> officers and agents in the event FiberMark ceases to
> treat Defendant's Leachate, as it is permitted to do by
> order of a United States Bankruptcy Judge.

(Dkt. entry no. 3, Pl. Br., at 2.) FiberMark contends that
NJDEP's continued drainage of its wastewater, or leachate, into
NJDEP's water treatment facility constitutes a violation of the
Clean Water Act ("CWA"), and involuntary servitude in violation

of the Thirteenth Amendment.  (Pl. Br., at 1.)  FiberMark contends that NJDEP should be preliminarily enjoined, pending a determination on the merits, from continuing to drain its leachate into FiberMark's treatment facility because FiberMark will suffer irreparable harm if the injunction is not granted. (Id.)

The Court has considered the papers submitted by the parties and heard oral argument on March 2, 2007.  The Court also conducted a teleconference with the parties on March 9, 2007, informing them of the Court's intention to grant a temporary restraining order (TRO) to FiberMark pending the Court's disposition of the preliminary injunction application.  (Dkt. entry no. 13.)  The Court issued the TRO on the same day.  (Dkt. entry no. 12.)  The Court hereby issues its findings of fact and conclusions of law as required by Federal Rule of Civil Procedure ("Rule") 52.  For the reasons stated herein, the Court is inclined to grant the motion.  However, because our legal analysis relies upon a ground not addressed by the parties in their briefing, we will issue an order allowing supplemental briefing before we rule on the application for a preliminary injunction.

## BACKGROUND AND FACTUAL FINDINGS

FiberMark is the owner of a property known as the Warren Glen Facility ("Facility").  (Pl. Br., at 3.)  The property is

2

adjacent to a solid waste disposal landfill known as the Warren Glen Landfill ("Landfill"). (Id.; Def. Br., at 4.) The prior owners of the Facility, Specialty Coatings Group, Inc. ("SCG"), entered into an agreement in 1991 ("1991 agreement") with the owner of the Landfill at that time, James River Paper ("JRP"). (Pl. Br., at 3.) Pursuant to the agreement, JRP provided SCG with access to the Landfill for disposal of the solid waste generated by the paper manufacturing in the Facility. (Compl., Ex. A, at 1.) In return, SCG agreed to receive and treat the leachate from the Landfill in its treatment lagoons at the Facility.[1] (Id., at 12.) The duration of this agreement "unless terminated earlier pursuant to the terms hereof," was "until the date on which closure of the New landfill occurs." (Id., at 9.) The leachate "collects in an underground culvert on the Landfill's property, travels across an area known as 'the Raceway,' and empties into the [Facility's] Warren Glen Lagoon

_____

[1]    Leachate is hazardous waste that is

produced when liquids, such as rainwater, percolate through wastes stored in a landfill. The resulting fluid will contain suspended components drawn from the original waste. Proper leachate management involves the storage of wastes in lined containers so that leachate may be collected before it seeps into soil or groundwater. The leachate will periodically be pumped out of the container and subsequently treated.

Chem. Waste Mgmt, Inc. v. United States, 869 F.2d 1526, 1530 (D.C. Cir. 1989).

from a pipe at the end of the culvert."  (Dkt. entry no. 8, Ex.
8, Affidavit of Michael Wright ("Wright Aff.") (bracketed
material added).)

The Landfill was most recently owned by Crown Vantage Paper
Co. ("Crown Paper"), which succeeded to the rights and
obligations of JRP.  (Id., Ex. B, at 3; Def. Br., at 4.)  Crown
Paper discharged its obligations under the 1991 agreement
pursuant to a court order issued during its bankruptcy
proceedings in California in March 2001.  (Compl., at 2.)  NJDEP
objected to Crown Paper's motion to abandon the property through
the bankruptcy proceedings.  As part of those proceedings, NJDEP
and Crown Paper entered into an agreement filed on March 2, 2001,
whereby Crown Paper agreed to "pay the state $1 million to be
used by the state or its designee to investigate, close, clean-
up, or otherwise remediate any environmental condition on any and
all property of the debtor in the State of New Jersey . . . ."
(Dkt. entry no. 7, Ex. 3, at 3.)

FiberMark, which now owns the Facility, succeeded to the
rights and obligations of SCG under the 1991 agreement.  (Compl.,
Ex. B, at 3.)  FiberMark's current National Pollutant Discharge
Elimination System ("NPDES") permit authorizing it to "discharge
treated process wastewater from the papermaking process and class
II landfill leachate" into the Musconetcong River does not expire
until July 31, 2010.  (Dkt. entry no. 7, Ex. E, Aff. of Jason
Lonardo ("Lonardo Aff.").)  FiberMark, however, discharged its

4

obligations under the 1991 agreement during bankruptcy proceedings in Vermont on June 23, 2005.[2]  (Compl., Ex. B.) FiberMark ceased operation of the Facility in March 2006, and "thus ceased industrial discharge into its wastewater treatment system on or about that time."  (Compl., at ¶ 14.)

NJDEP held a "kickoff meeting and site inspection" at the Landfill in April 2006 with representatives from the Louis Berger Group ("Berger"), which was retained by NJDEP to provide design services at landfills. (Dkt. entry no. 7, Affidavit of Craig Wallace ("Wallace Aff."), at ¶ 4.)  In May 2006 Berger agreed to the terms of the "Scope of Work" and budget submitted by NJDEP. (Id. at ¶ 6.)  In July 2006 Berger evaluated the leachate discharge flow at the Landfill for "design considerations."  (Id. at ¶ 10.)  Berger estimated the flow at between .1 and 1 gallon per minute.  (Id.)

FiberMark notified NJDEP via letter in June 2006 that it was closing the Facility and that NJDEP must accordingly cease the discharge of leachate from the landfill into FiberMark's treatment lagoons.  (Compl., at ¶ 18.)  NJDEP responded in August

---

[2]     It will be recalled that the other party to the 1991 agreement, Crown Paper as JRP's successor, discharged its obligations under that agreement during the Crown Paper bankruptcy, back in March 2001, thus destroying any mutuality of obligation under the 1991 contract at that time.  Nonetheless, FiberMark sought and obtained a discharge of its obligations under that same 1991 agreement in the FiberMark bankruptcy, as of June 23, 2005.

2006, informing FiberMark that it was its belief FiberMark was responsible for storage and treatment of the leachate, and explaining the steps NJDEP had already taken with Berger to "investigate potential leachate discharge options to eliminate the discharge to the FiberMark treatment lagoons." (Wallace Aff., at ¶ 12.)  During the same time period in August 2006 FiberMark gave NJDEP notice of the CWA violations alleged in the Complaint subsequently filed.  (Compl., at ¶ 19.)

Berger submitted its field effort proposal for the Landfill to NJDEP in October 2006, and in November 2006 a decision was made to temporarily divert the leachate into an infiltration trench cut into the upper portion of the landfill.  (Wallace Aff., at ¶¶ 16-20.)  NJDEP submitted a funding request for the project, and a scope of work and engagement package was prepared for Handex consulting and Remediation-Northeast ("Handex"), NJDEP's Subsurface and Recovery Service Contractor.  (Id.)

Handex notified NJDEP on approximately January 2, 2007, that the leachate flows were "significantly greater" than originally estimated.  (Id., at ¶ 22.)  After significantly larger leachate flows were observed following heavy rainfall in January 2007, the NJDEP decided to abandon the infiltration trench approach.  (Id., at ¶ 23.)  Handex subsequently discovered that a slotted pipe in the leachate system allowed rainwater to infiltrate the system.  (Id., at ¶¶ 27-28.)  The slotted pipe is now being replaced with

a solid pipe "so that storm water is removed from the leachate flow." (Id.)  According to NJDEP as of March 1, 2007, Handex will be responsible for the eventual installation of the leachate system, and Berger is working on a revised work plan for the leachate system.  (Id., at ¶¶ 29-30.)

FiberMark commenced this action against NJDEP on February 16, 2007, alleging violations of the CWA.  (Compl.)  Ten days after filing the complaint FiberMark applied for a preliminary injunction to enjoin NJDEP from continuing to deposit the leachate into its treatment lagoons, on the grounds that NJDEP is not only violating the CWA but also subjecting FiberMark to involuntary servitude in violation of the Thirteenth Amendment. (See dkt. entry nos. 3-5.)

## CONCLUSIONS OF LAW

This Court has subject matter jurisdiction over the claims asserted in the Complaint under 33 U.S.C. § 1365(a) and 28 U.S.C. § 1331.[3]  FiberMark alleges that NJDEP's discharge of leachate from the Landfill into its treatment lagoons violates the CWA and constitutes involuntary servitude in violation of the Thirteenth Amendment.  (Compl., at 1; App. for OTSC, at 10.)  While the Court finds that FiberMark has not shown a reasonable likelihood of success on either of these arguments, the Court finds a reasonable likelihood that NJDEP has violated FiberMark's procedural due process rights under the Fourteenth Amendment.

_____

[3]     We note that the Complaint, as styled by plaintiff, invokes the citizen suit provisions of the CWA against defendant. (Compl., at ¶¶ 18-23, 38.)  It was only in applying for the preliminary injunction that plaintiff asserted a federal constitutional claim, identifying the 13th Amendment as the basis.  (App. for OTSC, at 10.)  We have construed the Complaint to include claims under the United States Constitution, for purposes of the pending injunctive application.

Plaintiff states that when it gave notice to NJDEP under the CWA, it also gave notice of its intention to assert additional theories of liability including the federal Resource Conservation and Recovery Act, and various common law claims. (Id. at ¶¶ 18-21.)  See generally N.J. Tort Claims Act, 59 N.J.S.A. 59:1-1 et seq.; N.J. Contractual Liability Act, 59 N.J.S.A. 59:13-1 et seq.  Although drafted as a one-count pleading, plaintiff's Complaint contains broad allegations and variously asserts subject matter jurisdiction under 33 U.S.C. § 1365(a) (CWA), 28 U.S.C. § 1331 (federal question), and 28 U.S.C. § 1367 (supplemental jurisdiction).  (Id. at ¶ 31.)  Thus, at this initial pleadings stage in the case it is not clear which theories of liability plaintiff will seek to pursue.  Defendant is certainly entitled to invoke the Federal Rules of Civil Procedure to compel Plaintiff to identify and plead the causes of action plaintiff seeks to assert.

The parties have not briefed this issue and therefore the Court is issuing this Memorandum Opinion only and will order further briefing from the parties as to the procedural due process issue outlined below.  The TRO issued by the Court on March 9, 2007, will stay in effect pending briefing.  (See dkt. entry no. 12.)

I.    **Legal Standards**

    A.    **Preliminary Injunctions**

Injunctive relief is an "extraordinary remedy, which should be granted only in limited circumstances." Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp., 847 F.2d 100, 102 (3d Cir. 1988) (citations omitted).  To obtain such interim relief, a movant must demonstrate both a likelihood of success on the merits and the probability of irreparable harm absent the injunction.  Id. Thus, in determining whether to issue a preliminary injunction, the Court must consider whether (1) the movant has shown a reasonable probability of success on the merits, (2) the movant will be irreparably injured by denial of the relief, (3) granting the preliminary relief will result in even greater harm to the nonmoving party, and (4) granting the preliminary relief is in the public interest.  ACLU of N.J. v. Black Horse Pike Reg'l Bd. of Educ., 84 F.3d 1471, 1477 n.2 (3d Cir. 1996) (citations and quotations omitted); see AT&T Co. v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1427 (3d Cir. 1994) (citations and quotations omitted).  The Court should issue an injunction "only if the

plaintiff produces evidence sufficient to convince the district
court that all four factors favor preliminary relief." Id.
(citations omitted).

### 1.   Reasonable Probability of Success on the Merits

The movant seeking a preliminary injunction must demonstrate
a "reasonable probability of eventual success in the litigation."
Kershner v. Mazurkiewicz, 670 F.2d 440, 443 (3d Cir. 1982).  In
evaluating whether a movant has satisfied this first part of the
preliminary injunction standard, "[i]t is not necessary that the
moving party's right to a final decision after trial be wholly
without doubt; rather, the burden is on the party seeking relief
to make a prima facie case showing a reasonable probability that
it will prevail on the merits." Oburn v. Shapp, 521 F.2d 142, 148
(3d Cir. 1975).

### 2.   Irreparable Injury

"In general, to show irreparable harm a plaintiff must
demonstrate potential harm which cannot be redressed by a legal
or an equitable remedy following a trial." Acierno v. New Castle
County, 40 F.3d 645, 653 (3d Cir. 1994) (citations and quotations
omitted).  "Economic loss does not constitute irreparable harm."
Id.  Inexcusable delay in seeking a preliminary injunction may
defeat a movant's assertion of irreparable harm.  Kos Pharm.,
Inc. v. Andrx Corp., 369 F.3d 700, 726-27 (3d Cir. 2004).

### 3.   Harm to Nonmoving Party

The Court must also analyze whether the defendant will suffer irreparable harm if the preliminary injunction is granted. Id. at 727.  If the Court finds that such temporary relief may irreparably harm the defendant, then it must "balance the hardships" to ensure that the injunction does not harm the defendant more than denial of the injunction would harm the plaintiff.  Id.  The injury a defendant might suffer if an injunction is granted should be discounted if there are any facts indicating that the injury was self created.  Id. at 728. Further, "[i]rreparable harm must be of a peculiar nature, so that compensation in money alone cannot atone for it."  Id. at 727.  Thus, the Court should not consider financial damages when deciding whether to grant an injunction application.  Id. at 728.

### 4.   The Public Interest

The public interest will almost always favor the plaintiff, if the plaintiff demonstrates both a likelihood of success on the merits and irreparable injury.  AT&T Co., 42 F.3d at 1427 n.8.

### B.   § 1983

A plaintiff asserting civil rights violations under Section 1983 must establish that the defendant acted under color of state law to deprive him or her of a right secured by the United States Constitution or the laws of the United States.  Groman v. Twp. of Manalapan, 47 F.3d 628, 633 (3d Cir. 1995).  Section 1983 does

11

not create substantive rights, but instead provides a remedy for the violation of rights created by other federal laws. Id.; Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996).

The plaintiff, under Section 1983, must claim the defendant (1) acted under color of state law; and (2) deprived the plaintiff of a federal right. Groman, 47 F.3d at 633. "The color of state law element is a threshold issue; there is no liability under [Section] 1983 for those not acting under color of law." Id. at 638. The color of state law element requires that "the conduct allegedly causing the deprivation of [the plaintiff's rights] be fairly attributable to the State." Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (1982). Once it has been established that the defendant acted under color of state law, the Court must identify the federal right allegedly violated. See Groman, 47 F.3d at 633.

## II. Application of Legal Standards for Preliminary Injunction

### A. Reasonable Likelihood of Success on the Merits

#### 1. Clean Water Act

The Court clearly has jurisdiction over FiberMark's claims because of FiberMark's allegation that NJDEP is violating the CWA. (Compl.) Although the Court concludes that FiberMark has not shown a likelihood of success on the merits of its argument that the NJDEP is in violation of the CWA, a discussion of the

relevant provisions of the CWA provides necessary background to any constitutional claims sought to be asserted by plaintiff.

The CWA prohibits the discharge of any pollutant from a point source into navigable waters of the United States, unless the discharge is authorized by a permit issued by the EPA pursuant to the NPDES or by an EPA-authorized state agency.  See 33 U.S.C. §§ 1311(a), 1342.  NPDES permits impose limits on the amount of discharged pollutants from a "point source" and the EPA or authorized state agency monitors compliance through monthly discharge monitoring reports.  See 33 U.S.C. § 1342 (NPDES system); 40 C.F.R. § 122 (1989) (NPDES regulations).  Discharge of pollutants into navigable waters is unlawful and subject to criminal and civil penalties when not in compliance with the relevant sections of the CWA.  33 U.S.C. §§ 1311, 1319.  Likewise, discharge into any publicly-owned treatment works in violation of the relevant CWA standards is unlawful.  33 U.S.C. § 1317.

The Court finds here that the pipe from which NJDEP discharges the leachate into FiberMark's treatment facility is a "point source" within the meaning of the CWA because it is a "conveyance . . . from which pollutants are or may be discharged."  33 U.S.C. § 1362(14).  The Court also finds NJDEP is a "person" within the meaning of the CWA.  33 U.S.C. § 1362(5) (including "State" and "political subdivision of a state" in

definition of "person"); see <u>United States v. Mass. Bay Transp.</u>
<u>Auth.</u>, 614 F.2d 27 (1st. Cir. 1980) (holding that political
subdivision of the state was a "person" within meaning of Section
1321 of the CWA).

FiberMark, however, cannot demonstrate a reasonable
likelihood of success on its CWA claims because FiberMark has no
rights under the CWA to assert against NJDEP for discharging into
its private, NPDES-permitted treatment facility.  When NJDEP's
discharge reaches navigable waters, it is in compliance with
FiberMark's NPDES permit issued under Section 1342.  Thus, so
long as <u>NJDEP</u>'s leachate is treated at <u>FiberMark</u>'s private
treatment facility, NJDEP is not discharging it into a publicly-
owned facility or into navigable waters, and is therefore not
subject to liability under Section 1317 or 1319 of the CWA.  <u>See</u>
<u>United States v. Borowski</u>, 977 F.2d 27, 32 (1st Cir. 1992)
(noting there could be no violation of § 1317 unless the
pollutants ultimately ended up in a publicly-owned sewer and
treatment works).

## 2. Fourteenth Amendment

The Court finds that NJDEP's actions may constitute
violations of FiberMark's procedural due process rights under the

Fourteenth Amendment.[4]  The Fourteenth Amendment of the United States Constitution forbids a state to deprive persons of life, liberty, or property without due process of law.  U.S. Const. amend. XIV, § 1.  The Court, in analyzing a claim that a state actor failed to provide procedural due process must determine: "(1) whether the asserted individual interests are encompassed within the fourteenth amendment's protection of 'life, liberty, or property'; and (2) whether the procedures available provided the plaintiff with 'due process of law.'"  Alvin v. Suzuki, 227 F.3d 107, 116 (3d Cir. 2000).

"In order to state a claim for failure to provide due process, a plaintiff must have taken advantage of the processes that are available . . . unless those processes are unavailable or patently inadequate."  Id.  Where a claim is brought pursuant

---

[4]     FiberMark may have been able to claim a violation of its substantive due process rights in support of its application for a preliminary injunction as well.  See DiBlasio v. Zoning Board of Adj. for Twp. of W. Amwell, 53 F.3d 592, 600 (3d Cir. 1995) (holding that "ownership is a property interest worthy of substantive due process protection"), abrogated on other grounds, United Artists Theatre Circ., Inc. v. Twp. of Warrington, 316 F.3d 392 (3d Cir. 2003); see also Am. Marine Rail NJ, LLC v. City of Bayonne, 289 F.Supp.2d 569, 583 n.5 (D.N.J. 2003) (noting "The right of use [is] one of the bundle of rights attendant to ownership under the laws of property in all states").  FiberMark, however, does not argue and it does not appear that NJDEP has acted in a manner that "shocks the conscience" or even arbitrarily with regard to the leachate and therefore the Court will not address the merits of a potential substantive due process claim.  See United Artists, 316 F.3d at 399 (discussing standard for determining whether action violated substantive due process).

to Section 1983, "a procedural due process violation cannot have occurred when the governmental actor provides apparently adequate procedural remedies and the plaintiff has not availed himself of those remedies." Id. (holding that plaintiff's due process claim must fail where he failed to take advantage of post-deprivation procedures available to him). A plaintiff need not pursue available procedural remedies, however, where those procedures would be impinged with bias due to a lack of an impartial tribunal, or otherwise futile. Id. at 118-19.

FiberMark satisfies the first part of the analysis because NJDEP's continued use of FiberMark's treatment facility violates FiberMark's rights as a property owner "encompassed within the fourteenth amendment's protection of 'life, liberty, or property.'" Alvin, 227 F.3d at 116; see Klein v. Califano, 586 F.2d 250, 257 (3d Cir. 1978) (noting that "protected property interests are not limited to ownership of real or personal property but extend to an individual's 'legitimate claim of entitlement' to an acquired benefit"). "Before a governmental body may deprive a landowner of a property interest, it must provide due process." Rogin v. Bensalem Twp., 616 F.2d 680, 694 (3d Cir. 1980).

"The gravity of a deprivation is irrelevant to the existence of a property interest so long as the deprivation is not De mimimis." In re App. for Installation of a Pen Register, 610

16

F.2d 1148, 1156 (3d Cir. 1979).  In In re App., a case with property interests somewhat analogous to those alleged by FiberMark here, plaintiffs argued that "the due process clause entitles them to a hearing before the enforcement of a tracing order."  Id.  The Court held there was a deprivation of a property interest without due process because the state action "denied appellants the free use of their equipment and of the services of their employees, interests to which they are entitled as basic property and contract rights."  Id.  Here, as in In re App., the fact that NJDEP's deposit of the leachate into the treatment lagoons does not completely deprive FiberMark of its property interests is "irrelevant to the existence of a property interest" and it is sufficient that FiberMark has been compelled to "for a time forego other uses of its equipment and personnel." Id. at 1156; cf. Brooks-Scanlon Co. v. R.R. Comm'n of Louisiana, 251 U.S. 396, 397 (1920) (holding that Commission's requirement that carrier continue to carry on business at a loss deprived carrier of its property without due process of law).

     FiberMark also satisfies the second part of the analysis because NJDEP is a state actor which has deprived FiberMark of its property interests without due process of law.  See McKeesport Hosp. v. Accreditation Council for Graduate Med. Educ., 24 F.3d 519, 528 (3d Cir. 1994) (noting that state agencies are state actors largely because they are exercising

some form of delegated authority).  The adequacy of process required of the state actor varies with the facts of a particular situation.  <u>Rogin</u>, 616 F.2d at 694.  The Supreme Court has articulated a balancing test to determine the requirements of due process: "the private interest affected by the governmental action and the value of additional procedural safeguards are to be weighed against the fiscal and administrative burdens that additional procedures would impose on the government."  <u>Id.</u> (quoting <u>Mathews v. Eldridge</u>, 434 U.S. 319, 335 (1976)).  Some examples of due process include:

> (1) notice of the basis of the governmental action; (2) a neutral arbiter; (3) an opportunity to make an oral presentation; (4) a means of presenting evidence; (5) an opportunity to cross-examine witnesses or to respond to written evidence; (6) the right to be represented by counsel; and (7) a decision based on the record with a statement of reasons for the result.

<u>Rogin</u>, 616 F.2d at 694.

The communications between the parties in an effort to solve the discharge issue do not meet the requirements of due process warranted in this situation.  Although NJDEP promised it would "cut off the landfill leachate flow immediately on an interim basis until the long-term remedy is completed," this promise has yet to be fulfilled.  (Dkt. entry no. 8, Ex. G, 11-13-2006 letter from NJDEP to FiberMark.)  In response to FiberMark's letter informing NJDEP that as of early October 2006 it had incurred an estimated $257,400 in costs for the continued treatment of the

18

leachate, NJDEP responded that it did not "believe anything is owed to FiberMark." (Id.; Pl. Br., at 5.) NJDEP's position as of February 15, 2007, was simply that there was no solution or option for treating the leachate other than using FiberMark's treatment lagoons. (Dkt. entry no. 9, Email from NJDEP to FiberMark.)

While the Court understands NJDEP's dilemma in finding an adequate, cost-effective solution to treating the Landfill leachate, this dilemma does not justify the deprivation of FiberMark's constitutionally protected property interests without any kind of due process. NJDEP has no contractual right, and has not pointed to any other sources of authority that entitle it to continue introducing leachate into plaintiff's treatment facility and compel plaintiff to treat it.[5]

Given the level of intrusion by NJDEP on FiberMark's significant property interest, it is our preliminary conclusion that FiberMark was entitled to a greater degree of due process than it received before NJDEP determined that NJDEP was entitled to continue to use FiberMark's treatment lagoons. FiberMark received no process with regard to NJDEP's decision to continue

---

[5]    Any contractual right possessed by NJDEP as successor-in-interest under the 1991 agreement was terminated, at the latest, by the June 23, 2005 order in the FiberMark bankruptcy case. Although NJDEP points out that it was not noticed in that proceeding, (Tr. of 3-2-2007 oral arg., at 2:59), it has not sought a ruling either from this Court or the issuing bankruptcy court as of yet that would suffice to invalidate that order.

19

discharge of the leachate into the treatment lagoons despite its apparent lack of authority to do so.  The procedures, or lack thereof, by which NJDEP continues to deprive FiberMark of its property interests are likely "constitutionally deficient" because FiberMark has been given no opportunity to object to NJDEP's unauthorized use of its lagoons at a hearing or the equivalent before an impartial tribunal.  Rogin, 616 F.2d at 694; see Klein, 586 F.2d at 259-60 (holding that due process was not satisfied where no hearing was provided before deprivation of property interests).[6]

### 3. Thirteenth Amendment

FiberMark also contends relief is appropriate under the Thirteenth Amendment, because NJDEP is in effect subjecting it to involuntary servitude by forcing it to treat its leachate and extracting services from FiberMark's treatment lagoons.  (See Pl. Br., at 10.)  Our initial review of the sparse body of case law on involuntary servitude was favorable to this position.

---

[6]     The Court notes FiberMark is not precluded from seeking redress in federal court because it appears to have availed itself of any available administrative procedures.  FiberMark requested an "Adjudication Hearing and Stay of Permit Conditions" from the NJDEP seeking to exclude the Landfill leachate from the scope of the FiberMark NPDES permit, and was granted an adjudicatory hearing.  (Lonardo Aff., at ¶¶ 8-10; Tr. of 3-2-2007 oral arg.)  Thus, it appears that FiberMark exhausted the administrative remedies available as to its permit.  However, FiberMark has been offered no administrative process by which to challenge the continued flow of that leachate into FiberMark's private treatment facility.

However, a careful reading of the precedent, particularly the narrow view of involuntary servitude taken by the Third Circuit, leads us to question whether this is the appropriate grounds for finding a likelihood of success on the merits sufficient to support a preliminary injunction.

The Thirteenth Amendment prohibits "involuntary servitude enforced by the use or threatened use of physical labor or legal coercion." United States v. Kozminski, 487 U.S. 931, 944 (1988). "While the general spirit of the phrase 'involuntary servitude' is easily comprehended, the exact range of conditions it prohibits is harder to define." Id. at 942. Involuntary servitude includes "a condition of servitude in which the victim is forced to work for the defendant . . . by the use or threat of coercion through law or the legal process." Id. at 952; Steirer v. Bethlehem Area Sch. Dist., 987 F.2d 989, 999 (3d Cir. 1993). Although the Supreme Court in Kozminski defined involuntary servitude "for purposes of criminal prosecution under § 241 or § 1584," this definition has been adopted and applied in a variety of civil contexts. See Steirer, 987 F.2d at 998, 1000 (holding that mandatory community service program did not constitute involuntary servitude prohibited by Thirteenth Amendment).

The Third Circuit takes "a contextual approach to involuntary servitude by confining the Thirteen Amendment to those situations that are truly akin to African Slavery." Id. at

1000; Compare, United States v. Bertoli, 994 F.2d 1002, 1022 (3d Cir. 1993) (citing Steirer, supra, and noting that "a requirement that an attorney perform uncompensated service after entering an appearance in a criminal matter does not evoke in our minds the burdens endured by the African slaves in the cotton fields or kitchens of the antebellum south"), with In re Travel 2000, 264 B.R. 444, 449, 450 (Bankr. W.D. Mich. 2001) (noting that forcing landlord to provide services for a debtor while remaining unpaid "may also be a step toward violating the involuntary servitude prohibition of the Thirteenth Amendment" but not deciding the constitutional issue).  "Modern day examples of involuntary servitude have been limited to labor camps, isolated religious sects, or forced confinement."  Steirer, 987 F.2d at 999.  It is not involuntary servitude when the Government requires individuals to perform "well-established 'civic duties' such as military service and jury duty" that are owed by citizens to the state.  Id.

Plaintiff here argues that "a state may not exact, compel, or coerce a non-established civic duty from a limited segment of the population . . . when the coerced party [] has not volunteered to bear the cost of providing that public service and loses money in the process" and that "FiberMark simply has no duty under any notion of established civil law to use its resources, nor its employees to devote their labor, to treat

22

waste of any kind that is produced by the sovereign or another private citizen." (Pl. Br., at 11, 12.) On its face, this argument is not without merit because NJDEP has no legal authority by which it can force FiberMark to accept and treat NJDEP's leachate.[7] FiberMark has no way of stopping NJDEP's discharge of leachate into its treatment lagoon without blocking the discharge pipe. Blocking the pipe would result in discharging polluted water into the River, thereby creating liability under the CWA for FiberMark and possibly even NJDEP. (See dkt. entry no. 8, Exs. G & H.)

Applying the common definition of involuntary servitude to the situation at issue here, "the condition of servitude" is FiberMark being "forced to work for the defendant" by treating its leachate, and "the use or threat of coercion through law or the legal process" is the impending CWA civil and criminal penalties if FiberMark fails to treat the water. Kozminski, 487 U.S. at 952. The Court, however, utilizing the "contextual approach" required in the Third Circuit, finds it difficult to make the leap in reasoning required to find plaintiff's predicament "akin to African Slavery" or analogous to "the

---

[7]    NJDEP does have the authority to require FiberMark to maintain a NPDES permit relating to wastewater discharge from FiberMark's own property, because that property generates some amount of pollutant that must be treated even though all industrial activities have been discontinued. (Tr. of 3-2-2007 oral arg. at 2:21-25.)

burdens endured by the African slaves in the cotton fields or kitchens of the antebellum south." Steirer, 987 F.2d at 998; Bertoli, 994 F.2d at 1022.  Moreover, the situation also is not sufficiently analogous to "labor camps, isolated religious sects, or forced confinement," the limited examples of modern day involuntary servitude.  Steirer, 987 F.2d at 999.  Therefore while the Thirteenth Amendment argument is not totally without merit, the Court cannot conclude that FiberMark has shown a reasonable likelihood of success on its merits when the argument is analyzed using the contextual approach mandated by Third Circuit precedent.

**B.  Irreparable Injury**

FiberMark asserts that without the injunctive relief requested, NJDEP's "discharge will cause irreparable harm to the Musconetcong River and FiberMark."  (Pl. Br., at 13.)  More specifically, FiberMark contends that without an injunction from this Court, if FiberMark were to cease treating the discharge as it is authorized to do pursuant to the federal bankruptcy order, the resulting illegal discharges will cause environmental harm and subject FiberMark to fines and possible civil and criminal liability.  (Id. at 14; see § 1319 (enforcement provisions of CWA).)

The Court finds that without the preliminary injunction there would be irreparable harm to the Musconetcong River, as

24

noted by both parties.  (Pl. Br., at 13-14; Def. Br., at 15-16.)
Clearly, exposure of FiberMark to civil and criminal sanctions if
it resorts to self-help and stops treating the Landfill leachate
would constitute irreparable harm.  The Court further finds that
FiberMark's loss of a purchaser for the Warren Glen Facility due
to its inability to stop the leachate discharge and shut down its
treatment lagoons also constitutes irreparable harm, because of
the loss of alienability of the property and the speculative
nature of any damages.  (Compl., at ¶¶ 16, 17, 25-28.)  FiberMark
has not exercised "inexcusable delay in seeking a preliminary
injunction" that would defeat its irreparable harm argument.  Kos
Pharm., 369 F.3d at 726-27.  Thus, the Court concludes that the
harms alleged constitute irreparable injuries and therefore
warrant the injunctive relief requested.

C.   **Harm to NJDEP**

The Court must also analyze whether NJDEP will suffer
irreparable harm if the application for a preliminary injunction
is granted.  Id. at 727.  If the Court finds that such temporary
relief may irreparably harm NJDEP, then it must "balance the
hardships" to ensure that the injunction does not harm the
defendant more than denial of the injunction would harm the
plaintiff.  Id.  The injury a defendant might suffer if an
injunction is granted should be discounted if there are any facts
indicating that the defendant's injury is self-created.  Id. at

25

728.  The Court should not consider financial damages when deciding whether to grant an injunction.  Id. at 728.

The only harm to NJDEP that the Court finds could arise out of the injunctive relief requested is the increased cost of immediately ceasing to discharge the leachate and finding an alternative discharge solution.  NJDEP did not identify any other harm during briefing or oral argument.  The Court thus agrees with FiberMark that "the harm to the environment and the public at large in this case far outweighs the cost to Defendant who is charged with protecting them."  (Pl. Br., at 17.)

**D.   The Public Interest**

FiberMark has demonstrated a reasonable likelihood of success on the merits as well as irreparable harm, thus tipping the public interest factor in its favor.  See AT&T Co., 42 F.3d at 1427 n.8.  The irreparable environmental harms that could arise as a result of the Court's failure to issue an injunction ordering cessation of the leachate discharge by NJDEP further weighs the public interest in support of issuing the injunction.

**CONCLUSION**

The Court, for the reasons stated supra, will (1) order the parties to brief the issue of whether NJDEP has violated FiberMark's procedural due process rights under the Fourteenth Amendment, and (2) order the TRO issued by the Court on March 9, 2007, to stay in effect pending briefing.  The Court will issue an appropriate order.


        s/ Mary L. Cooper
**MARY L. COOPER**
United States District Judge

27